FOURTH DIVISION

AUGUST 8, 2002

1-00-3602

RANA NASSAR, a Minor; ODAIE NASSAR,    )

a Minor; LUAEY NASSAR, a Minor; and )

CKUSI NASSAR, a Minor; by their )

Mother and Next Friend, WAFIEH JAMAL ) Appeal from the 

NASSAR; and WAFIEH JAMAL NASSAR, ) Circuit Court of 

Individually, ) Cook County.

)

Plaintiffs-Appellants, )

)

v. ) 

)

COUNTY OF COOK, a body politic, ) 

individually, and d/b/a COOK COUNTY )

HOSPITAL, ) 

) 

Defendant-Appellee, ) 

)

and )

)

JAMES HAWKINS, M.D.; ABDUL )

HOSSEINIAN, M.D.; JOHN KLUTKE, M.D.; ) Honorable

FELICIA LANE, M.D.; LIGAYA MARASIGAN, ) Maureen Durkin Roy,

M.D.; JAMES SHEPHERD, M.D.; and LAMARR ) Judge Presiding.

TYLER, M.D.,
(footnote: 1) )       

) 

Defendants. )

JUSTICE HARTMAN delivered the opinion of the court:

Plaintiffs, Rana Nassar, a minor; Odaie Nassar, a minor; Luaey Nassar, a minor; and Ckusi Nassar, a minor, by their mother and next friend, Wafieh Jamal Nassar; and Wafieh Jamal Nassar, individually (plaintiffs), appeal from a jury verdict in favor of defendant, County of Cook, a body politic, individually, and d/b/a Cook County Hospital, in a retrial of an obstetrical malpractice action.  On appeal plaintiffs contend that the circuit court erred in: 
 (1) giving the long form proximate cause instruction; (2) refusing to give the missing witness instruction; (3) allowing defendant to present statistical evidence regarding other womens’ pregnancies; (4) allowing testimony of previously undisclosed opinions in violation of Supreme Court Rule 213 (177 Ill. 2d R. 213 (Rule 213)); and (5) denying plaintiffs’ motion for a new trial based on prejudicial remarks made during opening statements.

In 1990 Wafieh Nassar became pregnant with quadruplets.  On March 18, 1991, during the 22nd week of her pregnancy, Wafieh presented at Cook County Hospital complaining of symptoms consistent with pre-term labor.  She was hospitalized and remained there until her babies were born 47 days later at 29 ½ weeks gestation.  All four babies suffered intraventricular hemorrhages (IVH).  Plaintiffs brought this action claiming defendants failed to utilize proper techniques to prevent the premature delivery and that once premature delivery was imminent, defendants failed to administer corticosteroids, causing permanent neurological injuries in all four babies.  This case was tried in July 1999, resulting in a hung jury.  The case was retried in February 2000.  The following relevant evidence was adduced at the retrial. 

Dr. James Hawkins, who was called as an adverse witness by plaintiffs, testified that he examined Wafieh on March 18, 1991, when she first presented at the clinic at Cook County Hospital.  A monitor indicated that Wafieh was having contractions.  Her cervix was long, soft, and closed and she was suffering from an e-coli urinary tract infection (UTI), which can cause pre-term contractions.  Wafieh was admitted to the complicated obstetrics unit.  Dr. Hawkins testified that after high frequency low amplitude contractions were noted on March 27, 1991, Dr. Taheri ordered terbutaline which was administered on March 28, 1991.
(footnote: 2)  She did not receive any tocolytic drugs from March 18 through March 27, 1991.  On April 16, 1991, Wafieh was transferred to labor and delivery at 3:30 a.m. to start intravenous ritodrine; but it was not administered until 2 p.m. when her cervix was dilated one or two centimeters.  Dr. Ligaya Marasigan explained that intravenous ritodrine was not necessary at 3:30 a.m. because Wafieh’s cervix was still closed at that time. 

Dr. James Shepherd was called as an adverse witness by plaintiffs and testified that he treated Wafieh when she was transferred to the labor and deliver unit from April 16 through May 3, 1991.  Beginning on April 16, 1991, Wafieh was on continuous fetal monitoring with a few exceptions.  Wafieh never had regular uterine contractions that would be characterized as active labor.  From April 12 until May 3, 1991, Wafieh’s cervix progressed from one to three centimeters dilated which was a slow and very gradual change expected in a quadruplet pregnancy.   

Dr. Marasigan, who also was called as an adverse witness by plaintiffs, testified that Wafieh did not need tocolytic drugs from March 18 until March 27, 1991.  Wafieh had occasional uterine irritability, but not regular contractions.  Dr. Marasigan ordered terbutaline on March 28, 1991.  From April 21 until May 3, 1991,  Wafieh’s cervix remained two centimeters dilated.  On May 3, 1991, she progressed to three centimeters.  Wafieh's cervical change was expected because she was carrying quadruplets.  Dr. Marasigan wrote a note on May 1, 1991, to consider using steroids.  She could not recall why Wafieh was not given steroids.   Dr. John Klutke, one of Wafieh’s treating physicians was called as an adverse witness by plaintiffs and testified that when Wafieh experienced cervical change it was related to the over-distension of her uterus and unrelated to any contractions she was experiencing because she never had regular contractions.  He explained that Wafieh was at risk for pre-term labor because her uterus was distended with quadruplets.  He stated that it was not possible to have a quiescent uterus in a quadruplet pregnancy because of the over-distension of the uterus.  He described the contractions that occur as a result of an over-distended uterus as irregular low amplitude contractions that occur continually, but do not lead to labor.  Tocolytics are designed to prevent regular strong contractions that lead to labor, not irregular low amplitude contractions.   He further explained that the cervix thins out and dilates due to over-distension.  Regular uterine contractions cause rapid dilation of the cervix.  Wafieh did not have rapid cervical change from regular contractions.  She experienced a slow, gradual change from April 16, 1991, when her cervix was a fingertip closed until May 3, 1991, when it was dilated three centimeters.

Dr. Tyler who was called as an adverse witness by plaintiffs,  testified that in 1991 steroids were not shown to be beneficial in multiple gestations.  When Dr. Tyler saw Wafieh on May 4, 1991,  she told him she felt some moisture in the vaginal area.  He performed a digital vaginal examination which confirmed that the membranes were ruptured and the cervix was dilated to four centimeters.  Plaintiffs were delivered by cesarian section by Drs. Tyler and Hosseinian.  Dr. Tyler testified that Wafieh had experienced a very slow progression of cervical dilation over weeks, caused by the over-distention of her uterus and not by a regular contraction pattern.

Dr. Felicia Lane was called as an adverse witness by plaintiffs.  She testified that there is not one single definition of “active labor.”  Contraction activity as well as cervical dilation are taken into account.  With multiple gestations, three to four centimeters dilation is considered active labor.  She further stated that delaying the delivery of quadruplets when the mother is four centimeters dilated poses the risks of precipitous delivery and cord prolapse.  She stated that steroids were not the standard of care in 1991 and it is still unknown whether steroids are beneficial with quadruplets.

Dr. Eddie L. Swift, one of Wafieh’s treating physicians, testified that he would not have recommended that steroids be given to Wafieh because of the potential risk of pulmonary edema and because she had a UTI.  Dr. James Young testified that minor plaintiffs' neurological injuries were caused by IVH and their prematurity.

Plaintiffs’ expert witness, Dr. John Elliott, a perinatologist, testified that defendants deviated from the standard of care by:  (1) failing to properly utilize tocolytics; (2) failing to evaluate the change in contraction pattern and check magnesium sulfate levels on May 3, 1991; (3) allowing the magnesium sulfate level to drop to one on May 4, 1991; (4) allowing the fetal monitor to be disconnected on May 3, 1991; (5) Dr. Tyler performed an unnecessary and inappropriate vaginal examination on May 4, 1991; (6) failed to delay delivery after the rupture of the membranes on May 4, 1991; (7) failed to have Dr. Swift involved in the management of the case; and (8) failed to administer steroids on April 16, 1991, and every day thereafter until delivery.  Dr. Elliott stated that it was a deviation from the standard of care not to administer tocolytics to Wafieh from March 18 through March 27, 1991, not to change the tocolytic drug or dose on April 9, 1991, not to start intravenous ritodrine at 3:30 a.m. on April 16, 1991, and not to give Wafieh sufficient amounts of magnesium sulfate to successfully accomplish tocolysis.  According to Dr. Elliott, absent these deviations, the pregnancy could have been maintained to 32 weeks.  He further stated that had Wafieh been given steroids, the minor plaintiffs would be absolutely normal.  He agreed, however, that no studies have shown whether steroids are effective in quadruplet pregnancies.       

Dr. Lee Meadow, defendant's expert witness, agreed that steroids might have reduced the minor plaintiffs’ risk of IVH, but would not have reduced their risk of neurological injury associated with prematurity.  The cause of the minor plaintiffs’ neurological problems was their prematurity.  He disagreed with Dr. Elliott’s opinion that if steroids had been given the minor plaintiffs would be absolutely normal. 

Dr. Michael Socol, an obstetrician and gynecologist specializing in complicated obstetrics, testified as an expert witness for the defense.  Dr. Socol testified that defendant and all the defendant physicians met the standards of care in treating Wafieh and her four children.  He stated that steroids were not the standard of care in 1991.  Only one out of five pregnant women eligible for steroids in 1991 received them.  The effectiveness of steroids in high level multiple gestations has not been shown even currently.  On cross-examination, he stated that had Wafieh been given steroids the likelihood of the minor plaintiffs having neurological injury would have been diminished.

According to Dr. Socol, over the last 20 years, the incidence of pre-term birth has stayed the same and may have increased slightly.  It was appropriate not to administer tocolytics to Wafieh from March 18 through March 28, 1991.  It was reasonable not to administer intravenous ritodrine on the morning of April 16, 1991, in light of the cervical examination showing a closed cervix at that time.  Once tocolytics were administered in this case, the treatment was appropriate and aggressive.  The slow and progressive cervical change Wafieh experienced over a period of weeks was normal and expected.  He testified that the physicians could not have prevented Wafieh’s cervix from dilating to three centimeters on May 3, 1991, because it was going to happen due to the quadruplet pregnancy.  He strongly disagreed with Dr. Elliott’s opinion that if the tocolytics had been increased the pregnancy could have been maintained to 32 weeks.

During an offer of proof, Dr. Sum Pyati testified that steroids were discussed during interdisciplinary meetings regarding Wafieh's care.  She stated that it was decided not to administer steroids to Wafieh because of:  (1) uncertainty whether they were effective with quadruplets; (2) risk of pulmonary edema; and (3) concern that Wafieh recurrently had cultured positive for e-coli in the birth canal.   

On March 22, 2000, the jury returned a verdict in favor of defendant.  Plaintiff moved unsuccessfully for a new trial. 

I

Plaintiffs first contend that the circuit court erred in giving the jury the sole proximate cause instruction.  Over plaintiffs’ objection, the court gave the jury the long form of Illinois Pattern Jury Instruction, Civil, No. 12.05 (3d ed. 1995) (IPI 12.05).
(footnote: 3)  According to plaintiffs, this erroneous instruction coupled with defendant’s improper closing argument that the quadruplet pregnancy itself was the sole proximate cause of the minor plaintiffs’ injuries, prejudiced them, warranting a new trial.

Defendant first responds that plaintiffs have waived this argument by failing to tender special interrogatories from which it could be determined whether the jury reached the issue of causation.  Defendant argues that because the jury entered a general verdict, it must be presumed that the jury resolved the issue of negligence in favor of defendant and therefore never reached the issue of causation.  See 
Perry v. Saleda
, 34 Ill. App. 3d 729, 340 N.E.2d 314 (1975) (a general verdict creates a presumption that all material issues of fact upon which proof was offered were found in favor of the prevailing party.) 
 Relying on 
LaSalle National Trust v. Swedish Covenant Hospital
, 273 Ill. App. 3d 780, 652 N.E.2d 1089 (1995) (
LaSalle
), defendant contends that because the jury did not reach the issue of causation, any error in the proximate cause instruction could not have prejudiced plaintiffs.
  
LaSalle
 does not hold, however, that a plaintiff must tender special interrogatories in order to preserve for appeal an issue regarding proximate cause instructions, nor does defendant cite any authority supporting that position.
(footnote: 4)  This issue is properly before this court.

Plaintiffs argue that the sole proximate cause instruction was improper as a matter of law because Wafieh’s quadruplet pregnancy was a condition and not a cause.  When considering questions of proximate cause, Illinois courts draw a distinction between a condition and a cause.  If the negligence charged does nothing more than furnish a condition which made the injury possible and that condition causes an injury by the subsequent independent act of a third party, the creation of that condition is not the proximate cause of the injury.  
First Springfield Bank & Trust v. Galman
, 188 Ill. 2d 252, 720 N.E.2d 1068 (1999).  According to plaintiffs, Wafieh’s quadruplet pregnancy furnished a condition which made the injury possible; but their injuries were caused by the defendant’s subsequent negligent treatment of that condition.  

Defendant responds that plaintiffs’ “condition vs. cause” argument ignores the medical evidence produced at trial that something other than the conduct of defendant was the sole proximate cause of plaintiff’s injuries.  Defendant relies on 
McDonnell v. McPartlin
, 192 Ill. 2d 505, 736 N.E.2d 1074 (2000) (
McDonnell
), where 
the court explained that the second paragraph of IPI 12.05 applies where there is evidence that something other than the defendant’s conduct is the sole proximate cause of the plaintiff’s injury.  The court went on to note that the “something other than the defendant’s conduct” need not be a negligent cause.  According to defendant, the evidence in this case that quadruplets always deliver prematurely, prematurity causes injuries, and the minor plaintiffs’ prematurity was the sole proximate cause of their injuries, supports the theory that the non-negligent cause of plaintiffs’ injuries was the quadruplet pregnancy itself. 

Each party has the right to have the jury clearly and fairly instructed upon each theory which was supported by the evidence.  
Leonardi v. Loyola University of Chicago
, 168 Ill. 2d 83, 658 N.E.2d 450 (1995) (
Leonardi
).  To justify an instruction, some evidence in the record must support the theory.
  It is within the circuit court’s discretion to determine what issues are raised by the evidence and whether an instruction should be given.  
In re Nancy M.
, 317 Ill. App. 3d 167, 739 N.E.2d 607 (2000).  The test for determining the propriety of tendered instructions is whether the jury was fairly, fully, and comprehensively informed as to the relevant principles considering the instructions in their entirety.  
Leonardi
, 168 Ill. 2d at 100.  The notes on use indicate that the long form of IPI 12.05 is only appropriate “where there is evidence tending to show that the sole proximate cause of the occurrence was something other than the conduct of the defendant.”  IPI Civil 12.05, Notes On Use, at 12-11.  If the jury was presented with some competent evidence tending to support defendant’s theory that the quadruplet pregnancy was the sole proximate cause of plaintiffs’ injuries, then the instruction was proper.  

Both Drs. Meadow and Young testified that the cause of minor plaintiffs’ neurological injuries was their prematurity.  As plaintiffs point out, both Dr. Socol and Dr. Meadow agreed that if the pregnancy had been prolonged the likelihood of the minor plaintiffs having neurological injuries would have been diminished.  Dr. Socol’s testimony, however, indicates that the pregnancy could not have been prolonged.  Dr. Socol testified that Wafieh’s cervical change, which eventually led to her premature labor, was slow and progressive and was due to the over-distention of her uterus because of the quadruplet pregnancy, not contractions.  He stated that the doctors could not have prevented Wafieh from dilating to three centimeters on May 3, 1991; “this was going to happen because of the quadruplet pregnancy.”   Drs. Tyler and Klutke agreed that Wafieh’s cervical change was due to uterine distention and not to a regular contraction pattern.     

Plaintiffs point out that Dr. Socol agreed that if steroids had been given the likelihood of neurological injuries to the minor plaintiffs would have diminished.  He also stated, however, that steroids do not eliminate IVH or respiratory distress syndrome.  Dr. Socol testified that despite the best efforts of physicians and the use of all modalities of therapy in the management of high order multiple gestations, babies are still born with the effects of prematurity.  Dr. Meadow agreed that if steroids had been given the likelihood of IVH and respiratory distress syndrome were diminished.  He further stated, however, that giving Wafieh steroids would not have decreased the likelihood of neurological injuries in the minor plaintiffs.  Dr. Lane testified that the efficacy of steroids for quadruplets was unknown.  

As the foregoing demonstrates, defendant presented some evidence to support the giving of the sole proximate cause instruction and the circuit court did not abuse its discretion in giving it.  

In a related argument, plaintiffs contend that defendant’s closing argument identifying the quadruplet pregnancy itself as the sole proximate cause of the minor plaintiffs' injuries was improper.  In closing argument a party may discuss any competent evidence that was introduced, as well as, all reasonable inferences that may be drawn from it.  
McDonnell
, 192 Ill. 2d at 524.  Based on the evidence discussed above, a reasonable inference could be drawn that the quadruplet pregnancy was the sole proximate cause of the minor plaintiffs’ injuries.  Therefore, defendant was entitled to make this argument to the jury.

II

Plaintiffs next contend that the circuit court erred in refusing to give Illinois Pattern Jury Instruction, Civil, No. 5.01 (3d ed. 1995) (the missing witness instruction) (IPI 5.01) based on defendant’s failure to call Dr. Taheri, one of Wafieh’s treating physicians, who had testified at the first trial.  IPI 5.01 allows a jury to draw an adverse inference from a party’s failure to produce a witness when:  (1) the witness was under the control of the party to be charged and could have been produced by reasonable diligence; (2) the witness was not equally available to the adverse party; (3) a reasonably prudent person under the same or similar circumstances would have produced the witness if he believed the testimony would be favorable to him; and (4) no reasonable excuse for the failure to produce the witness has been shown.  
Johnson v. Owens-Corning Fiberglas Corp.
, 233 Ill. App. 3d 425, 599 N.E.2d 129 (1992) (
Johnson
).  Whether to give IPI 5.01 is a matter within the  court’s discretion and its decision will not be disturbed absent an abuse of that discretion.  
Simmons v. University of Chicago Hospitals and Clinics
, 162 Ill. 2d 1, 642 N.E.2d 107 (1994) (
Simmons
).

Dr. Taheri was not equally available to plaintiffs because he  was an employee of defendant at the time of the second trial.  
Simmons
, 162 Ill. 2d at 8; IPI 5.01, Committee Comments, at 5-3 through 5-4 ("A witness is not ‘equally available’ to a party if there is a likelihood that the witness would be biased against him, as for example *** an employee of the other party.”)  It is irrelevant to the question of equal availability that the defense agreed to produce any present employee of Cook County Hospital without subpoena because the
 concern is the bias of the witness.  See 
Simmons
, 162 Ill. 2d at 9.

Plaintiffs argue that Dr. Taheri’s testimony was unfavorable to defendant because the opinions he gave at the first trial contradicted the opinions of Dr. Socol, defendant’s expert witness at the second trial, on two issues.  Plaintiffs first claim that Dr. Taheri would have contradicted Dr. Socol’s testimony that they expect tocolytics will gain about 48 hours in the pregnancy because at the first trial Dr. Taheri testified that tocolytics could get a woman an additional 30 days of pregnancy.  The record shows, however, that Dr. Taheri merely agreed with plaintiffs’ counsel that “[s]ome studies show tocolysis has an effect for gaining 7 days, some gain 30 days, some gain 6 days.  *** you could probably find many, many different studies to show different gains in the tocolytic period.”  Dr. Taheri’s testimony did not contradict Dr. Socol’s opinion on this issue.  

Plaintiffs next claim Dr. Taheri's testimony at the first trial, that Wafieh had a quiescent uterus, contradicted Dr. Socol's testimony that it is impossible to obtain a quiescent uterus in a woman carrying quadruplets.  Dr. Taheri testified at the first trial that there were occasional periods when Wafieh did not have a quiet uterus.  When asked whether women pregnant with quadruplets ever have quiescent uteruses, Dr. Socol responded that “I guess it depends how we define quiescent.”  Dr. Taheri’s testimony did not contradict that of Dr. Socol.  It may be observed also that Dr. Taheri's testimony contained many statements favorable to the defense, including his own exoneration and that of his fellow employees from negligence.  
Moreover, defendant's excuse for not calling Dr. Taheri, in not wanting to prolong the trial with cumulative testimony, was reasonable.  See 
Adami v. Belmonte
, 302 Ill. App. 3d 17, 704 N.E.2d 708 (1998) (IPI 5.01 is not warranted where the unproduced witness’ testimony would be merely cumulative.)

The circuit court did not abuse its discretion in refusing to tender IPI 5.01 where Dr. Taheri's testimony was not adverse to defendant and was cumulative.
(footnote: 5)        

III

Plaintiffs next contend that the circuit court abused its discretion in admitting certain statistical evidence including: (1) Dr. Socol's testimony that in 1991 only one out of five eligible pregnant women were given steroids; (2) Dr. Meadow's testimony that he treats more children today whose mothers were given steroids than in the past; and (3) Dr. Elliott's testimony regarding an article that studied 71 quadruplets and indicated that on average pre-term labor began at 24.5 weeks and delivery occurred on average seven weeks later at 31.5 weeks.  According to plaintiffs, this statistical evidence should have been excluded because it had no bearing on whether the standard of care was met in this case and was not relevant to the issue of causation.  

Plaintiffs principally rely on 
Timblin v. Kent General Hospital
, 640 A.2d 1021 (Del. Super. Ct. 1994) (
Timblin
), where the Delaware Supreme Court found that
 
evidence of the  statistical probability of injury occurring regardless of whether the defendant followed the standard of care was inadmissible.  
Timblin
 is inapplicable because the complained of testimony in this case does not involve a prediction of statistical probabilities.  Plaintiffs failed to show how Dr. Meadow's testimony regarding his personal experience involved statistics.   Dr. Socol's testimony was a statement of an empirical fact reflecting the custom and practice of obstetricians in administering steroids in 1991.  Evidence of custom and practice are proper to assist the jury in determining the applicable standard of care.  
Advincula v. United Blood Services
, 176 Ill. 2d 1, 678 N.E.2d 1009 (1996).  As defendant points out in its brief "[w]hether an injury was likely to occur is irrelevant regarding whether the standard of care was followed; whether physicians were using steroids in 1991 is relevant regarding whether steroids were the standard of care in 1991."
(footnote: 6)  His testimony was not confusing or prejudicial, but relevant and probative on the issue of whether steroids were the standard of care in 1991.  

With regard to Dr. Elliott’s testimony, the article properly was used to impeach his opinion that if Wafieh’s pregnancy had been managed properly with tocolysis the pregnancy could have gone 32 - 34 weeks and not to prove standard of care.  
See 
Darling v. Charleston Community Memorial Hospital
, 33 Ill. 2d 326, 211 N.E.2d 253 (1965) (expert witnesses may be cross-examined concerning the views of recognized authorities in their field); 
Walski v. Tiesenga
, 72 Ill. 2d 249, 381 N.E.2d 279 (1978). Plaintiffs' concerns that the article was not “scientific enough” go to the weight to be given the article and not admissibility. 

 The admission of evidence is within the discretion of the circuit court and its ruling will not be reversed absent an abuse of that discretion.  
Seef v. Ingalls Memorial Hospital
, 311 Ill. App. 3d 7, 724 N.E.2d 115 (1999) (
Seef
).  The court did not abuse its discretion in admitting the complained of testimony.
(footnote: 7)
IV

Plaintiffs next contend that they are entitled to a new trial because of defendant’s Rule 213 violations.  Specifically, plaintiffs make two arguments: (1) that defendant violated Rule 213 when it failed to adopt formally the testimony introduced at the first trial that it intended to offer at the second trial and (2) that the court abused its discretion by allowing testimony regarding previously undisclosed opinions.

Rule 213 in effect at the time of the subject trial provided that upon written interrogatory a party must disclose the subject matter, conclusions, opinions, qualifications, and reports of any witnesses who will offer any opinion testimony and seasonably supplement any previous answers when additional information becomes known.  177 Ill. 2d R. 213.  The committee comments in effect at the time of the subject trial provided that “in order to avoid surprise, the subject matter of all opinions must be disclosed pursuant to this rule and Supreme Court Rule 218.”  177 Ill. 2d R. 213, Committee Comments, at XXX - XXXI.  Supreme Court Rule 218(c) provides “[a]ll dates set for the disclosure of opinion witnesses and the completion of discovery shall be chosen to ensure that discovery will be completed not later than 60 days before the date on which the trial court reasonably anticipates the trial will commence.”  166 Ill. 2d R. 218(c). 

A

Plaintiffs first argue that defendant violated Supreme Court Rules 213 and 218 by failing to disclose the opinions of certain witnesses until two weeks before trial.  Some testimony was admitted during the first trial over plaintiffs’ Rule 213 objections.  Following the mistrial, the case was reset for trial on January 10, 2000.  On December 22, 1999, two weeks prior to the second trial, defendant filed a supplemental Rule 213 disclosure which stated that defendant adopted "the testimony of all of the witnesses who testified at the trial in July, 1999."  Plaintiffs’ moved unsuccessfully to bar these late  disclosures, arguing that they were being made less than 60 days before trial.  Plaintiffs moved unsuccessfully 
in
 
limine
 “[t]o bar and prohibit any and all conversations, recollections, observations, and opinions of defendants, that were not disclosed prior to the first trial of this case.”   

Plaintiffs argue that 
Seef
, 
Regala v. Rush North Shore Medical Center
, 323 Ill. App. 3d 579, 752 N.E.2d 443 (2001), and 
Copeland v. Stebco Products Corp.
, 316 Ill. App. 3d 932, 738 N.E.2d 199 (2000), compel the conclusion that timely, formal adoption of objected to trial testimony from a mistrial in the same case prior to a retrial is required by Rule 213.  Each of those cases stands for the proposition that Rule 213 disclosure requirements are mandatory and subject to strict compliance by the parties.     

The committee comments then effective made clear that one of the primary purposes of Rule 213 was to avoid surprise.  177 Ill. 2d R.213(g), Committee Comments, at XXX - XXXI.  There was no surprise here because the complained of testimony was presented at the first trial.  See 
Tsoukas v. Lapid
, 315 Ill. App. 3d 372, 733 N.E.2d 823 (2000).  Moreover, plaintiffs were given the opportunity to depose  the witnesses who allegedly disclosed new opinions at the first trial, before they testified at the second trial. 

Rule 213 does not require formal adoption of objected to trial testimony from a mistrial in the same case prior to a retrial.

B

Plaintiffs next argue that the circuit court abused its discretion by allowing several witnesses to present previously undisclosed opinions to the jury in violation of Rule 213.  Admission of evidence pursuant to Rule 213 is within the court’s discretion and its ruling will not be reversed absent an abuse of discretion.  
Department of Transportation v. Crull
, 294 Ill. App. 3d 531, 690 N.E.2d 143 (1998).  

Dr. Swift's testimony that he would not have necessarily recommended that steroids be given to Wafieh because, in addition to other factors, she had "an overwhelming urinary tract infection," was not a new opinion.  At his deposition, Dr. Swift stated that a factor to be considered when determining if steroids were to be used was possible masking of infection in the mother.   He further stated that Wafieh would not have been an appropriate candidate for steroids "if there was some concern regarding infection."  Plaintiffs complain that Dr. Swift previously did not state that Wafieh had an infection.  This omission is inconsequential because the statement that Wafieh had a UTI was not an opinion, but a factual statement and therefore not subject to Rule 213.  See 
Seef
, 311 Ill. App. 3d at 23.  Dr. Tyler's testimony that cervical change is the most important factor in determining whether a woman is in active labor was not a new opinion.  At several points during his deposition, Dr. Tyler stated that active labor is defined as four centimeters dilation or more.  Similarly, Dr. Lane's testimony that there is more than one definition of active labor and that some people define it based on “certain cervical dilations” was not a new opinion where she testified at the first trial that "there are several different definitions of labor, but yes, normally labor means regular uterine contractions with cervical dilation."    

Plaintiffs argue that because Dr. Meadow was a board certified neonatologist who testified that he followed the literature with respect to steroids, his testimony that to his knowledge steroids have not been shown to be effective in high-order multiple gestations, amounted to a previously undisclosed opinion that steroids were not effective in high-order multiple gestations.  Any error from this testimony would not warrant a new trial because plaintiffs can establish no prejudice where this testimony was cumulative of previously introduced testimony.  See 
Mitchell v. Palos Community Hospital
, 317 Ill. App. 3d 754, 740 N.E.2d 476 (2000);  
Linn v. Damilano
, 303 Ill. App. 3d 600, 708 N.E.2d 533 (1999); 
Parker v. Illinois Masonic Warren Barr Pavilion
, 299 Ill. App. 3d 495, 701 N.E.2d 190 (1998).    

Plaintiffs argue that Dr. Klutke testified improperly that he would never increase levels of magnesium sulfate to the point of complication to attain the unattainable goal of a quiet uterus.  

Plaintiffs cannot object where they first elicited the testimony during their examination of Dr. Klutke.  
Seef
, 311 Ill. App. 3d at 23.  Moreover, Dr. Klutke's testimony did not involve new opinions where he stated during his deposition that it would not be proper to "overdose a patient on magnesium sulfate to prolong the labor" and that it was not clear that increasing the level of magnesium sulfate on May 3, 1991, was going to help Wafieh. 

The circuit court did not abuse its discretion by admitting the complained of testimony.             

V

Plaintiffs next contend that they are entitled to a new trial because of defense counsel’s prejudicial remarks during opening statement which were not supported by the evidence.  Plaintiffs have waived this issue by failing to object to the comments during trial.  
Hilgenberg v. Kazan
, 305 Ill. App. 3d 197, 711 N.E.2d 1160 (1999) (
Hilgenberg
).   

Waiver aside, comments by an attorney in an opening statement concerning evidence to be introduced at trial are not improper if made in good faith and with reasonable belief the evidence is admissible, although the intended proof referred to is later excluded.  
Yedor v. Centre Properties, Inc.
, 173 Ill. App. 3d 132, 527 N.E.2d 414 (1988) (
Yedor
).  In the absence of good faith, however, or where prejudice is clearly shown, the rule is to the contrary.
  No statement should be made in counsel’s opening statement which counsel does not intend to prove or cannot prove.  
Hilgenberg
, 305 Ill. App. 3d at 210.

Defense counsel's statement that Wafieh had had recurrent e-coli infections was supported by the medical records which show that she tested positive for an e-coli UTI on December 24, 1990, February 25, 1991, and March 11, 1991.  Although she had no positive urine cultures after March 28, 1991,  Dr. Marasigan testified that Wafieh complained of UTI symptoms on April 10, 1991, and was given a course of antibiotics beginning on April 15, 1991.  Moreover, Wafieh had a UTI following delivery.  The statement that they decided not to use steroids because she had had recurrent e-coli infections was supported by the testimony of Drs. Swift and Pyati.

Improper comments do not constitute reversible error unless the party has been prejudiced substantially.  
Magna Trust Co. v. Illinois Central Railroad Co.
, 313 Ill. App. 3d 375, 728 N.E.2d 797 (2000).  Plaintiffs have failed to show any prejudice where they argued in closing argument that assertions made by defense counsel in opening statements were not proven (
Costa v. Dresser Industries, Inc.
, 268 Ill. App. 3d 1, 642 N.E.2d 898 (1994); 
Yedor
, 173 Ill. App. 3d 
at 144) and the court admonished the jury several times that opening statements are not evidence(
Zelinski v. Security Lumber Co. of Kankakee
, 133 Ill. App. 3d 927, 479 N.E.2d 1091 (1985); 
Yedor
, 173 Ill. App. 3d at 144). 

Accordingly, for the reasons set forth above, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HOFFMAN, P.J. and THEIS, J., concur. 

FOOTNOTES
1:
The individual doctor defendants were dismissed prior to closing arguments and rendering of the verdict, and are not parties to this appeal. 

2:
Terbutaline, ritodrine, and magnesium sulfate were the three tocolytic drugs in use in 1991.

3:
The long form of IPI 12.05 states:

“If you decide that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the plaintiff, it is not a defense that something else may also have been a cause of the injury.

[However, if you decide that the sole proximate cause of injury to the plaintiff was something other than the conduct of the defendant, then your verdict should be for the defendant.]” 

4:
Defendant further argues that plaintiffs are estopped from   raising this issue because they successfully objected to the  special interrogatories submitted by defendant, which would have identified whether the jury reached the issue of causation.  Defendant submitted two special interrogatories: (1) "Was your verdict unanimous as to any single act of negligence?" and (2) "Did you unanimously find that a single act of negligence proximately caused the plaintiffs' injuries?"  These interrogatories would not have identified whether the issue of causation was reached.  Moreover, they properly were denied because they do not test the general verdict "against the jury's determination as to one or more specific issues of ultimate fact."  
Simmons v. Garces
, 198 Ill. 2d 541, 763 N.E.2d 720 (2002).

5:
Even if the circuit court abused its discretion in failing to give the missing witness instruction, plaintiffs are not entitled to a new trial because they cannot show any prejudice where the court specifically allowed them to argue the missing witness issue to the jury and plaintiff’s counsel took full advantage of that ruling.  See  
Hajian v. Holy Family Hospital
, 273 Ill. App. 3d 932, 652 N.E.2d 1132 (1995) (the refusal to give an instruction will result in a new trial only where the party shows serious prejudice to her right to a fair trial)
. 

6:
Plaintiffs further argue that Dr. Socol's testimony was improper because it was based solely on a study published in 1994, three years after the relevant time period.  The basis of Dr. Socol's opinion was explored outside the presence of the jury before the testimony was allowed.  Dr. Socol stated that his opinion was based on his training, background, and experience, as well as, discussions and meetings with colleagues across the country.  He stated that the 1994 article put into print what was already known among practicing obstetricians across the country.

            

7:
Plaintiffs also contend that the circuit court abused its discretion by allowing defense counsel to argue in closing argument that (1)
 the rate of prematurity has not changed in 20 years; and (2) only one out of five physicians were giving steroids in 1991.

Plaintiffs have waived any argument regarding the second statement by failing to object to it at trial.  
Gillespie v. Chrysler Motors Corp.
, 135 Ill. 2d 363, 553 N.E.2d 291 (1990).  With regard to the first statement, counsel's comments were based on evidence properly introduced at trial.  Dr. Socol testified, without objection, that the incidence of pre-term birth had stayed the same over the last 20 years.