No. 2--02--1001      

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

BARBARA KERSEY, Special Administrator    ) Appeal from the Circuit Court

of the Estate of Shawnna M. Kersey,    ) of Winnebago County.

Deceased,    )

    )

Plaintiff-Appellant,    )  

    )       

v.    ) No. 98--L--289   

    )

RUSH TRUCKING, INC., a Missouri    )

Corporation; RED ARROW    )

CORPORATION, a Missouri Corporation;    ) 

RICHARD E. SMITH; and EDWARD    ) 

D. LYLE,    ) Honorable

    ) Ronald L. Pirrello,

Defendants-Appellees.    ) Judge, Presiding.

.

            JUSTICE GROMETER delivered the opinion of the court:

Plaintiff, Barbara Kersey, as special administrator of the estate of her deceased daughter, Shawnna M. Kersey, filed a negligence action alleging claims under the Wrongful Death Act (740 ILCS 180/0.01 
et seq
. (West 1996)) and the Survival Act (755 ILCS 5/27--6 (West 1996)) against defendants, Rush Trucking, Inc. (Rush), Red Arrow Corporation (Red Arrow), Richard E. Smith, and Edward D. Lyle, in connection with a vehicular accident.  Following a trial in the circuit court of Winnebago County, the jury returned a verdict in defendants' favor.  On appeal, plaintiff argues that the trial court erred in refusing to give the jury two of her proposed instructions.  For the reasons that follow, we reverse the judgment of the circuit court and remand the cause for a new trial.

I.  BACKGROUND

The collision that resulted in Shawnna's death occurred at the intersection of Alpine and Spring Creek Roads in Rockford, Illinois.  Alpine Road 
is a four-lane highway that runs north and south.  Spring Creek Road is a four-lane thoroughfare that runs east and west.  The intersection of Alpine Road and Spring Creek Road is controlled by a traffic signal.  Left turn lanes exist for all directions at the intersection.  At the time of the collision, the speed limit for vehicles traveling south on Alpine Road at the intersection was 45 miles per hour.  On 
December 12, 1996, at about 6 p.m., Shawnna was driving her station wagon north on Alpine Road.  At about the same time, Edward D. Lyle was driving a truck south on Alpine Road in the curb lane.  As Shawnna approached the Spring Creek Road intersection, she entered the left turn lane.  While Shawnna was turning west onto Spring Creek Road, her vehicle and Lyle's truck collided.  Shawnna eventually died of the injuries she sustained in the accident.

At trial, Richard E. Smith testified that at the time of the collision Lyle was an employee of "Smitty's Express," a trucking business Smith started 
in 1985.  Smith explained that prior to September 1998, Smitty's Express was an in-house agent for Red Arrow and Rush.  Under this arrangement, Smitty's Express supplied commercial vehicles and hired drivers but operated under the authority of federal and state operating licenses procured by Red Arrow and Rush.  Smith testified that an advisor from Rush provided him with information regarding a reconstruction of the accident performed by Red Arrow and Rush.

Lyle testified that he was familiar with the intersection at which the accident occurred.  Lyle recalled that shortly before the accident he was driving south on Alpine Road, descending a hill that precedes the intersection.  Lyle testified that when he was about 100 yards from the intersection, he noticed that the traffic signal was red for through traffic, but the green arrow signal was illuminated for traffic wishing to turn left.  Lyle slowed down to an estimated speed of 25 to 30 miles per hour as he approached the intersection.  Once the green circular signal illuminated, Lyle proceeded into the intersection.  Lyle noticed a station wagon starting to make a left turn and come towards his lane of traffic.  At that point, he applied his brakes and swerved to the right.  However, he was unable to avoid the collision.  Lyle stated that at the time of the accident the weather was clear and it was not raining.  In addition, Lyle admitted that approaching this particular intersection at a speed of 35 miles per hour would have been dangerous.

Karen Rhoads testified that at about 6 p.m. on December 12, 1996, she was traveling north on Alpine Road when she came to a stop at the Spring Creek Road intersection.   Rhoads heard the impact from the collision and observed a truck pushing a station wagon.

Joseph Douglas Holloway testified that at the time of the collision he was driving south on Alpine Road.  Holloway was traveling in the inside lane.  Holloway slowed down as he approached the Spring Creek Road intersection because the traffic signal was red.  Holloway first observed Shawnna's vehicle as the traffic signal changed to green.  As Holloway accelerated, he noticed a station wagon traveling north enter the left turn lane to go west on Spring Creek Road.  According to Holloway, the station wagon "made kind of a little bit of a hesitation stop like it was going to stop, and then it proceeded."  Holloway slammed on his brakes and swerved to avoid the station wagon.  Holloway was unaware of Lyle's presence until he heard the impact.  Holloway estimated that Lyle was traveling at the speed limit.

Jennifer Cliningsmith testified that at the time of the collision she was also traveling south on Alpine Road in the inside lane.  Cliningsmith was driving a pickup truck with a five-speed manual transmission.  There was a car directly in front of Cliningsmith and a truck to her right.  Cliningsmith recalled that there was a little bit of snow and rain the day of the accident. Cliningsmith testified that as she approached the Spring Creek Road intersection, she began to downshift her vehicle from third to second gear because the traffic signal was red.  When the traffic signal turned to green, Cliningsmith upshifted her vehicle from second to third gear.  She estimated that she would have been going 25 to 30 miles per hour at the time and that the truck to her right was going about the same speed.  As she was shifting from second to third gear, Cliningsmith noticed a station wagon traveling north on Alpine Road enter the left turn lane to head west on Spring Creek Road.  According to Cliningsmith, the station wagon was "coming quick."  Cliningsmith applied her brakes and took evasive action to avoid a collision with the car in front of her.  According to Cliningsmith, the car in front of her "barely missed" the station wagon.  Cliningsmith testified that the roads were wet and that her vehicle slid a bit as she braked to avoid the collision.

Deputy Anthony Moore of the Winnebago County sheriff's police investigated the December 12, 1996, accident.  Moore is a certified accident reconstructionist.  Moore testified in his capacity as an employee of the Winnebago County sheriff's police and as an expert retained by plaintiff.  Moore testified that the accident was reported at 6:03 p.m. and that he arrived at the scene at 6:26 p.m.  Moore stated that at the time of his arrival, the roads were dry.  Moore explained that if the pavement had been wet, there would not have been a skid mark.  However, Moore determined that the truck that Lyle was driving left a 102-foot-long skid mark on the roadway.  According to Moore, the truck skidded for 25 feet before striking the passenger side of Shawnna's station wagon.  Moore determined the point of impact by locating the gouge marks in the pavement.  Following impact, the truck pushed the station wagon in a southwesterly direction for 77 feet before coming to rest.

Moore's investigation consisted of three different analyses: the slide-to-stop test, the "barrier equivalent velocity" test, and the momentum test.  The slide-to-stop test measures the speed of a vehicle at the first visible skid.  Moore testified that, with respect to the slide-to-stop test, the length of the skid mark and the type of roadway surface are significant.  In order to conduct this analysis, Moore had to determine the coefficient of friction.  To measure the coefficient of friction, Moore dragged a "sled" across the roadway surface.  The "sled" consisted of half of a motor vehicle tire attached to a scale.  The tire, which was filled with cement and steel fragments, weighed 75 pounds.  Moore stated that the coefficient of friction is usually around 0.67 to 0.70.  Moore performed the dragging exercise six times.  Averaging the results of the six drags, Moore determined the coefficient of friction to be 1.08.  Moore acknowledged that the coefficient of friction he obtained was higher than average for this type of pavement.  However, he attributed the higher number to the fact that the skid mark ran "across the grain of the pavement" so that "it was almost like a new pavement" and that the truck was moving on an untraveled portion of the pavement.  Using 1.08 as the value of the coefficient of friction, Moore determined that the speed of the truck was 57 miles per hour at the beginning of the first visible skid.

The "barrier equivalent velocity" or "crush" test measures speed at impact.  This test involves measuring crush damage.  Accordingly, several days after the crash, Moore measured the crush damage to the station wagon.  Based on these measurements, Moore determined that Lyle's truck was traveling 52 miles per hour at impact.  The momentum test also determines speed at impact.  The momentum test involves evaluating the directions in which the vehicles travel prior to impact and the directions in which they travel after impact.  Using the momentum test, Moore calculated the speed of the truck at 58 miles per hour.  Based on all three of his analyses, Moore concluded that the truck driven by Lyle was traveling 57 miles per hour at the beginning of the first visible skid and 52 miles per hour at the time of impact.

Using the momentum test, Moore also determined that Shawnna's vehicle was traveling 26 miles per hour at the time of impact.  Moore opined that given the speed of Shawnna's vehicle, if the truck had been going between 25 and 35 miles per hour, the collision would not have occurred.  Moore also opined that if the truck had been going 40 miles per hour, the two vehicles may have "touched bumpers," but he even doubted that.

On cross-examination, Moore admitted that the coefficient of friction is generally reduced by 25% when determining the speed of trucks and that he did not reduce the coefficient of friction in this case.  Moore cautioned, however, that a 25% reduction in the coefficient of friction does not yield a corresponding 25% reduction in the speed of the vehicle since the 25% is taken off of the coefficient of friction at the beginning of the formula.  Moore also stated that his investigation revealed that at the time of the collision, traffic traveling south on Alpine Road had the green circular signal.  Moore conceded that if southbound traffic had the green circular signal, it was not possible for Shawnna to have had a green or yellow arrow signal.  Moore testified, however, that Shawnna would have had the green circular signal and that Shawnna could have turned left on a green circular signal provided she yielded to oncoming traffic.  On redirect examination, Moore testified that the 25% reduction in the coefficient of friction that is generally applicable to trucks did not apply in this case because the vehicles were moving sideways.
  

The parties also presented the videotaped deposition of 
Daniel Broughton, the safety supervisor for Rush and Red Arrow at the time of the accident.  Broughton testified that part of his job as safety supervisor was to investigate collisions and that he investigated the accident that occurred on December 12, 1996.  Broughton acknowledged that someone for Rush and Red Arrow did some reconstruction of the December 1996 accident.  However, Broughton stated that he never spoke to that individual.

Prior to the close of evidence, defendants announced that they would not be calling Gerald E. Cohn, Ph. D., an expert to whom they referred in their opening statement.  Defendants stated that they were not calling Cohn because they covered his expected testimony during their cross-examination of Moore.

At the jury instruction conference, plaintiff tendered two instructions based on Illinois Pattern Jury Instruction, Civil, No. 5.01 (Supp. 2003) (hereinafter IPI Civil (Supp. 2003) No. 5.01), also known as the "missing-witness instruction" or the "missing-evidence instruction."  IPI Civil (Supp. 2003) No. 5.01 provides:

"5.01 Failure to Produce Evidence or a Witness

If a party to this case has failed [to offer evidence] [to produce a witness] within his power to produce, you may infer that the [evidence] [testimony of the witness] would be adverse to that party if you believe each of the following elements:

1. The [evidence] [witness] was under the control of the party and could have been produced by the exercise of reasonable diligence. 

2. The [evidence] [witness] was not equally available to an adverse party.

3. A reasonably prudent person under the same or similar circumstances would have [offered the evidence] [produced the witness] if he believed [it to be] [the testimony would be] favorable to him.

4. No reasonable excuse for the failure has been shown."  IPI Civil (Supp. 2003) No. 5.01.

Plaintiff argued that she was entitled to a missing-evidence instruction regarding defendants' failure to produce the accident-reconstruction report alluded to by Smith and Broughton.  While acknowledging Broughton's testimony, defendants insisted that they were unaware of any accident- reconstruction report.  Defendants admitted to an "investigation" conducted by an insurance company and believed that Smith's testimony referred to that investigation.  However, defendants did not consider the investigation to be a reconstruction.  The trial court declined to give the jury a missing- evidence instruction, stating, "I think the strength of [defendants'] case is their eyewitness testimony and *** there is good reason not to present the reconstruction evidence." 

Plaintiff's second IPI Civil (Supp. 2003) No. 5.01 instruction was a missing-witness instruction based on defendants' failure to call Cohn.  Defendants reiterated that the points they wished to elicit through Cohn's testimony were covered by the cross-examination of Moore.  For instance, defendants asserted that Cohn's primary criticism of Moore's testimony involved the high value he obtained for the coefficient of friction.  Defendants noted that Moore himself testified that the coefficient of friction was high.  The trial court declined to give the missing-witness instruction, concluding that plaintiff did not meet all four criteria listed for giving the instruction.  Nevertheless, the court informed plaintiff that she could raise the issue of the missing witness during her closing argument.  Ultimately, the jury returned a verdict in defendants' favor.  Plaintiff then filed a posttrial motion arguing, among other things, that the trial court erred in refusing to tender to the jury the missing-witness and missing-evidence instructions.  Following the denial of plaintiff's posttrial motion, this timely appeal ensued.

II.  ANALYSIS

On appeal, plaintiff assigns error to the trial court's failure to tender her proposed missing-witness and missing-evidence instructions.  As noted above, IPI Civil (Supp. 2003) No. 5.01 allows a jury to draw an adverse inference from a party's failure to offer evidence or to produce a witness.  The instruction should be given only when a foundation is presented which suggests that: (1) the witness or evidence was under the control of the party to be charged and could have been produced by reasonable diligence; (2) the witness or evidence was not equally available to the adverse party; (3) a reasonably prudent person under the same or similar circumstances would have offered the evidence or produced the witness if he believed the evidence or the witness's testimony would have been favorable to him; and (4) no reasonable excuse for the failure to offer the evidence or to produce the witness has been shown.  
Hawkes v. Casino Queen, Inc.
, 336 Ill. App. 3d 994, 1008-09 (2003); 
Nassar v. County of Cook
, 333 Ill. App. 3d 289, 298 (2002); 
Roeseke v. Pryor
, 152 Ill. App. 3d 771, 781 (1987).  However, the instruction is not warranted if the evidence that has not been offered or the witness that has not been produced is merely cumulative of facts already established. 
Jenkins v. Dominick's Finer Foods, Inc.
, 288 Ill. App. 3d 827, 831 (1997).  The decision whether to tender IPI Civil (Supp. 2003) No. 5.01 to the jury is within the sound discretion of the trial court, and that decision will not be reversed absent a clear abuse of discretion.  
Simmons v. Garces
, 198 Ill. 2d 541, 573 (2002);  
Jenkins
, 288 Ill. App. 3d at 831.  With these principles in mind, we address plaintiff's arguments.

A.  Missing-Witness Instruction

Plaintiff first contends that the circuit court erred in refusing to give IPI Civil (Supp. 2003) No. 5.01 based on defendants' failure to call Cohn.  According to plaintiff, the four foundational requirements for tendering IPI Civil (Supp. 2003) No. 5.01 for a missing witness were satisfied, Cohn's testimony would not have been cumulative, and she was prejudiced by the trial court's failure to give the missing-witness instruction.  Defendants respond that the circuit court did not err in failing to give the missing-witness instruction because not all factors supporting the instruction were present, Cohn's testimony would have been cumulative, and the court's decision did not constitute prejudicial error.

Defendants do not dispute the presence of the first two foundational requirements for a missing-witness instruction.  Indeed, plaintiff satisfies the first two requirements because, Cohn, as an expert witness hired by defendants, was under defendants' control for purposes of testifying, and thus was unavailable to plaintiff as a witness.  See 
Hollembaek v. Dominick's Finer Foods, Inc.
, 137 Ill. App. 3d 773, 776-77 (1985) (holding that a doctor hired by the defendant to examine the plaintiff is under the defendant's control for the purpose of testifying and thus unavailable to the plaintiff as a witness); 
Ciborowski v. Philip Dressler & Associates
, 110 Ill. App. 3d 981, 986 (1982) (holding that witness hired by the defendant with the intention of having him testify on the defendant's behalf is under the defendant's control for purposes of IPI Civil (Supp. 2003) No. 5.01); 
but see 
Taylor v. Kohli
, 252 Ill. App. 3d 852, 858 (1993), aff'd 162 Ill. 2d 91 (1994) (holding that trial court erred in tendering missing-witness instruction to jury where the plaintiff advised the defendant of his decision to abandon expert witness 19 months prior to trial). 

With respect to the third factor, plaintiff argues that Cohn's testimony would have been unfavorable to defendants because it contradicted the testimony of defendants' eyewitnesses and demonstrated that the speed at which Lyle was driving was above the posted limit and unsafe for the intersection.  The record reveals that Cohn was hired by defendants in February 2002 "to evaluate Deputy Moore's reconstruction of the accident and identify any major mistakes, inaccuracies and weaknesses" in Moore's opinion.  In addition, defendants requested Cohn to "develop [his] own analysis of the accident, including a computation of the speed of the truck."  To this end, Cohn prepared a report and was deposed regarding his findings.

At his deposition, Cohn testified that he has a Ph. D. in nuclear physics.  Although Cohn admitted that he was not trained in accident reconstruction, he stated that "the first accident reconstruction [he] did as an expert witness" was in 1977.  He also testified that he has been deposed as an accident-reconstruction expert between 10 and 20 times and that he has provided speed analysis testimony as it relates to accident reconstruction.  Furthermore, Cohn testified that his business concentrates in two areas of practice: technical consulting and specialty education.  Cohn testified that between 25% and 60% of his technical consulting business deals with accident reconstruction and between 10% and 25% of his specialty education business deals with accident reconstruction.  Accordingly, Cohn held himself out as an expert in accident reconstruction.

Cohn opined that the value that Moore placed on the coefficient of friction was "unusually high and should be justified."  Cohn explained that the typical coefficient of friction range for new pavement is 0.65 to 1.0 while the typical coefficient of friction range for well-traveled pavement is 0.55 to 0.70.  Cohn characterized the intersection where the collision occurred as well traveled, and he opined that the 1.08 value that Moore placed on the coefficient of friction was not "characteristic of a well-traveled surface."  At trial, Moore attributed the high value he obtained for the coefficient of friction to the fact that the truck was moving in a direction that simulated the effect of new pavement and that the truck was on an untraveled portion of the pavement.  Thus, Moore provided a justification for the high value he calculated for the coefficient of friction.  Consequently, had Cohn been retained by defendants solely to criticize Moore's opinions, we may have been inclined to accept their argument that Cohn's testimony was cumulative of facts already established.  See 
Hollembaek
, 137 Ill. App. 3d at 777.

However, Cohn was also retained to "develop [his] own analysis of the accident, including a computation of the speed of the truck."  At his deposition, Cohn testified regarding spreadsheets he prepared.  Cohn explained that the spreadsheets contain his estimations of the initial speed of the truck for various coefficient-of-friction values.  Among other things, the spreadsheets list Cohn's computations of the estimated speed of the truck at three different phases: (1) postimpact, 
i.e.
, 
the speed at which the truck exited the impact scene; (2) preimpact, 
i.e.
, the speed of the truck instantaneously prior to the impact with the passenger vehicle; and (3) preskid, 
i.e.
, the speed of the truck just before it started to skid.  In calculating the preskid speed of the truck, Cohn used values for the coefficient of friction ranging from 0.5 to 1.2.  For instance, Cohn testified that, using a value of 1.05 for the coefficient of friction, the truck would have been traveling 94.696 feet per second.  Cohn converted feet-per-second to miles per hour by dividing the former by 88 and then multiplying the resulting quotient by 60.  Thus, using 1.05 as the value for the coefficient of friction, Cohn calculated that the preskid speed of the truck would have been 64.6 miles per hour.  Cohn also testified that the preskid speed of the truck would have been 64.8 miles per hour if the value used for the coefficient of friction was 1.08.

As noted previously, Cohn considered the intersection at which the collision occurred as well-traveled, and he testified that the typical coefficient of friction range for well-traveled pavement is 0.55 to 0.70.   According to the spreadsheets Cohn generated, using a value of 0.55 for the coefficient of friction, the lowest typical value for well-traveled roads, the truck would have been traveling 68.287 feet per second preskid.  Converting that number to miles per hour yields a speed of 46.559 miles per hour.  Using a value of 0.70 for the coefficient of friction, the highest typical value for well-traveled roads, the truck would have been traveling 77.153 feet per second.  Converting that number to miles per hour yields a speed of 52.604 miles per hour.  Thus, operating under Cohn's assumptions, the truck was traveling between 46.559 and 52.604 miles per hour just before it started to skid.

Ultimately, however, Cohn concluded that the evidence was consistent with the truck traveling a speed "at or below the posted limit of 45 miles per hour."  Cohn explained his conclusion as follows:

"Well, I don't remember if or where I said this, but, again, from the articles here, you see that for trucks, coefficients of trucks are lower.  They are lower -- I should have -- what's the right word you use?  I should have derated the values of coefficient of friction I use because it's a truck we are talking about.  And if those coefficients are lower, then considering also, the response time that would be required for what Office Moore asserts happened happening [
sic
], it seems unlikely to me that it all could have happened with the truck -- the way it did with the truck going at the speed it's claimed to have been going, but a speed below the limit would be more *** reasonable."  

When Cohn was asked later on what he based his opinion that the truck was moving at 45 miles per hour or below, Cohn responded:

"Based on, first, that I have a hard time accepting a coefficient of friction as high as was measured.  The other points that I've tried to make here see, to indicate to me that there is some question about Officer Moore's analysis, but I think that the evidence would be more consistent with a lower speed.  I just think it's more likely that that happened."

We note, however, that the jury also heard testimony from Moore that the 25% reduction to the coefficient of friction should not have been applied in this case because of the manner in which the truck was moving.  The jury also heard Moore's explanation regarding the high value he obtained for the coefficient of friction.  Obviously, if the jury chose to believe Moore's explanations, the unfavorable nature of Cohn's testimony is readily apparent: Cohn's testimony supported plaintiff's theory that Lyle was driving above the posted speed limit at the time of the collision.  See 
Van Steemburg v. General Aviation, Inc.
, 243 Ill. App. 3d 299, 320 (1993) (holding that where the defendant failed to call its witness, and the plaintiff's expert's testimony was not comparable to the defendant's expert's testimony, missing-witness instruction should have been given).

Defendants now claim that the spreadsheets generated by Cohn were merely charts "showing what speeds would result for skid marks of a given length at different coefficients of friction."  We fail to see the relevance of this argument.  Moore testified that in calculating the speed of the vehicle using the slide-to-stop test, the two variables are the coefficient of friction and the length of the skid mark.  In this case, Moore measured the length of the skid mark.  Although varying the length of the skid mark would have undoubtedly altered the speed calculations, defendants offered no testimony that the length of the skid mark as measured by Moore was incorrect.

Defendants also assert that Cohn "did not validate any of the coefficients of friction, he did not account for moisture on the road surface, and he did not apply the 25% reduction factor for heavy trucks."  Exactly what defendants mean in arguing that Cohn did not "validate" the coefficients of friction is unclear.  However, we note that Cohn did testify that the typical coefficient of friction range for well-traveled pavement is 0.55 to 0.70.  Further, while Cohn did not account for moisture on the road surface, there was contradictory testimony on this point.  Finally, as we note above, Cohn did testify regarding the 25% reduction factor for trucks.  However, the jury was also presented with contradictory testimony on this aspect.  See 
Dugan v. Weber
, 175 Ill. App. 3d 1088, 1094-95 (1988) (holding that trial court properly tendered missing-witness instruction to jury; although the defendant's expert's report and deposition contained some matters that were favorable to the defendant, materials also contained matters unfavorable to the defendant).

Turning to the fourth requirement, we conclude that defendants did not proffer a reasonable excuse for the failure to produce Cohn as a witness.  Defendants contend that "[a]ll of the essential points that [they] would have raised in Dr. Cohn's direct examination had already been raised in the very effective cross examination of Moore."  In other words, defendants' excuse is that Cohn's testimony would have been cumulative of the testimony they elicited from their cross-examination of Moore.  We disagree.

 A missing-witness instruction is not warranted if the evidence that has not been offered or the witness that has not been produced is merely cumulative of facts already established.   
Jenkins
, 288 Ill. App. 3d at 831; 
Hollembaek
, 137 Ill. App. 3d at 777.  At his deposition, Cohn admitted that he was retained by defendants "to identify any major mistakes, inaccuracies and weaknesses in Officer Moore's opinion" and to make an independent determination of the speed of the truck driven by Lyle.  In addition, during their opening statement, defendants referred to Cohn's expected testimony.  In this regard, defense counsel commented:

"The only testimony that you're going to hear about [Lyle] exceeding the speed limit is going to come from Officer Moore.  And while I'm not a math expert – that's one of the reasons why I went to law school – we are going to call a doctor of physics, and we're going to show that some of the math calculations, not necessarily the formulas – but if you put in different numbers or make different assumptions, you come up with different speeds.

And you will find that when we compare with some of those different inputs and use the same formulas that Officer Moore did that you're going to come up with speeds very similar to what the eyewitnesses testified that [Lyle] was traveling."

Simply put, while one of the purposes of Cohn's testimony was to criticize Moore, it is also clear from the record that defendants intended to call Cohn to provide an independent analysis of the speed of the truck.  Moore did not and could not testify regarding Cohn's independent determination of the speed of the truck driven by Lyle.  Thus, we conclude that Cohn's testimony would not have been cumulative of the testimony elicited from Moore on cross-examination.  See 
Dugan
, 175 Ill. App. 3d at 1095 (concluding that missing witness's testimony was not cumulative to other testimony presented where missing witness's testimony concerned personal observations and findings).

Defendants assert that even if the trial court erred in failing to tender IPI Civil (Supp. 2003) No. 5.01 to the jury based on their failure to call Cohn, any error was harmless.  We disagree.  A new trial will be granted where a party shows that its right to a fair trial has been seriously prejudiced by the denial of an instruction.  
Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.
, 273 Ill. App. 3d 977, 988 (1995).  In this case, many, if not all, of plaintiff's allegations of negligence in her complaint centered on the speed at which the truck was traveling.  During opening statements, defendants informed the jury that they would present the testimony from a "doctor of physics" to explain that if the variables in the formulas used by Moore to estimate the speed of the truck driven by Lyle were changed, "you come up with different speeds."  Defendants also informed the jury that when these variables are plugged into the formulas used by Moore, "you're going to come up with speeds very similar to what the eyewitnesses testified that [Lyle] was traveling."  The jury was never presented with this testimony.

Moreover, we do not believe that the circuit court's decision to permit plaintiff to comment on defendants' failure to call Cohn during closing argument rendered the error harmless.  Although plaintiff informed the jury of defendants' failure to call an expert witness during closing argument, defendants explained away their failure by telling the jury that they elected not to call Cohn because his testimony was covered during cross-examination.  As plaintiff notes, without the jury instruction, her argument was just argument.  It did not have the authority and force of law that she was entitled to by IPI Civil (Supp. 2003) No. 5.01.  See 
Bargman v. Economics Laboratory, Inc.
, 181 Ill. App. 3d  1023, 1028 (1989) (holding that the trial court should have given missing-witness instruction despite parties stipulation read to jury that (1) the defendant retained the missing witness as an expert, (2) the witness was privy to certain information regarding the litigation, and (3) the witness was available to testify, where foundational requirements for instruction were satisfied).  Accordingly, we conclude that there was evidence establishing the existence of all four foundational requirements and the trial court abused its discretion in not tendering the missing-witness instruction to the jury.

Citing to 
Betts v. Manville Personal Injury Settlement Trust
, 225 Ill. App. 3d 882, 901 (1992), defendants assert that accepting plaintiff's argument "would effectively require a party to call a retained opinion witness in every case or else risk the jury receiving a missing witness instruction at the close of the case."  
Defendants exaggerate the impact of our decision.  The missing-witness instruction will be given only when evidence is presented that suggests the existence of the four foundational requirements and the testimony of the missing witness would not be cumulative of facts already established.  See 
Jenkins
, 288 Ill. App. 3d at 831.

B.  Missing-Evidence Instruction

Plaintiff also argues that the circuit court erred in refusing to give IPI Civil (Supp. 2003) No. 5.01 based on defendants' failure to provide her with a copy of the accident reconstruction purportedly conducted by Red Arrow and Rush.  According to plaintiff, the foundational requirements for tendering IPI Civil (Supp. 2003) No. 5.01 based on missing evidence were satisfied.  Defendants respond that the circuit court did not abuse its discretion in refusing to give the instruction where the court determined that no such evidence ever existed.  Although we have already determined that this cause must be remanded for a new trial, we address this issue because it will arise on remand.  
Koonce v. Pacilio
, 307 Ill. App. 3d 449, 461 (1999). 

Prior to trial, plaintiff submitted to defendants a request for production of documents.   See 166 Ill. 2d R. 214.  Relevant here, plaintiff requested the following materials:

"27.  Copy of any and all accident reports, including but not limited to reports filled out by Edward D. Lyle and/or employees or agents of Red Arrow or Rush Trucking.

* * *

33.  Any and all accident reports, investigative reports and inspection reports pertaining to the injuries sustained by any party to the lawsuit, except those documents which fall under the protection of privileges or work product, containing factual material concerning the date of the occurrence which is the subject matter of this lawsuit."

In a letter dated March 10, 1999, defendants responded to plaintiff's inquiries as follows.  With respect to inquiry 27, defendants stated, "None other than the statement given by Edward Lyle to his insurance company.  Investigation continues."  With respect to inquiry 33, defendants stated, "None at present.  Investigation continues."

However, at trial, two witnesses testified regarding the existence of an accident-reconstruction report.  The following colloquy occurred between plaintiff's counsel and Broughton, the safety supervisor for Rush and Red Arrow at the time of the accident:

"Q.  Okay.  Now someone for Rush Trucking and Red Arrow Corporation did some reconstruction of the collision back in December of '96; correct?

A. Correct.

Q. Okay.  But you never talked to that person; correct?

A. No, sir."

In addition, defendant Smith testified:

"Q.  Okay.  You heard Mr. Broughton testify that in December of 1996 Red Arrow and Rush did a reconstruction of this collision.

A.  Yes.

Q.  You heard him say that?

A.  Yes.

Q.  Did you ever see it?

A.  Through an advisor, they gave me information in regards to it.  I never saw it."

Despite this testimony, defendants claim that no such accident-reconstruction report exists.  However, defendants never questioned these two witnesses regarding the report's existence.  If the accident- reconstruction report did not exist as defendants claim, it was incumbent upon them to question the witnesses on this matter.  Defendants did not do this.  Accordingly, we presume that the report exists.

In addition, we find that the foundational requirements for the missing-evidence instruction have been satisfied.  First, the testimony suggests that the evidence was under defendants' control and could have been produced by the exercise of reasonable diligence.  Second, since the accident- reconstruction report was never produced through discovery, defendant cannot claim that it was equally available to plaintiff.  See 
Jenkins
, 288 Ill. App. 3d at 832.  Third, a reasonably prudent person under the same or similar circumstances would have offered the evidence if he believed it to be favorable to him.  Finally, although defendants offered a reason for failing to produce the accident- reconstruction report, 
i.e.
, the report was nonexistent, the evidence at trial contradicted defendants' claim.  Accordingly, we conclude that the trial court abused its discretion in failing to give the missing-evidence instruction.  See 
Jenkins
, 288 Ill. App. 3d at 832 (holding that in personal injury action the plaintiff's failure to produce photographs of alleged injuries warranted missing-evidence instruction despite the plaintiff's claim that photographs had been lost); 
Dugan
, 175 Ill. App. 3d at 1094 (holding that in medical malpractice action the defendant's failure to introduce the plaintiff's X rays warranted missing-evidence instruction despite the defendant's claim that X rays were allegedly lost since the defendant admitted that X rays had been mailed to him).

III.  CONCLUSION

 For the aforementioned reasons, we reverse the judgment of the circuit court of Winnebago County and remand the cause for a new trial.

Reversed and remanded with directions.

McLAREN and BOWMAN, JJ., concur.